IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 07-cv-01571-MSK-BNB

ESTATE OF EMILY RICE, by SUSAN GARBER and ROY RICE as co-personal representatives,
SUSAN GARBER, as parent and co-personal representative of the Estate of Emily Rice, and
ROY RICE, as parent and co-personal representative of the Estate of Emily Rice,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO,
DENVER DEPARTMENT OF HEALTH AND HOSPITALS, d/b/a "DENVER HEALTH MEDICAL CENTER" AND "DENVER Health",
JASON HAUKOOS, M.D., in his individual and official capacities,
LISA CHENG, M.D., in her individual and official capacities,
ROBERT KELLY COSTIN, R.N., in her individual and official capacities,
MARIA BOUZIANE, R.N., in her individual and official capacities,
MARY CLEARY, R.N., in her individual and official capacities,
NANCYE ZIMMER, R.N., in her individual and official capacities,
WENDY JO ANDERSON, R.N., in her individual and official capacities,
CAPTAIN JACOB KOPYLOV, in his individual and official capacities,
CAPTAIN JOHN RIORDON, in his individual and official capacities,
SERGEANT LOREN COLLIER, in his individual and official capacities,
SERGEANT HANS RASTEDE, in his individual and official capacities,
SERGEANT RICHARD ROBERSON, in his individual and official capacities,
SERGEANT KAROLINA SICH, in her individual and official capacities,
SERGEANT ANTHONY SULLIVAN, in his individual and official capacities,
DEPUTY KERI ADCOCK, in her individual and official capacities,
DEPUTY JULIANA BARRON, in her individual and official capacities,
DEPUTY SARAH BRIGHT, in her individual and official capacities,
DEPUTY LAKISHA MINTER, in her individual and official capacities,
DEPUTY FAUN GOMEZ, in her individual and official capacities,
DEPUTY SHERMAINE GUZMAN, in her individual and official capacities,
DEPUTY AMANDA LINE, in her individual and official capacities,
DEPUTY JULIE KIRKBRIDE, in her individual and official capacities,
DEPUTY MICHELLE SALEMI, in her individual and official capacities,
DEPUTY JESSICA WANROW, in her individual and official capacities,

JOHN AND JANE DOES 1 THROUGH 20, DENVER CITY AND COUNTY SHERIFFS
DEPUTIES AND MEDICAL PERSONNEL, in their official and individual capacities,

Defendants.

---

**ORDER**

---

This matter is before me on **Law Enforcement Defendants' Joint Motion for Protective Order to Prohibit Discovery Regarding Personal, Confidential, and Non-Relevant Information** [Doc. # 236, filed 3/13/2008] (the "Motion for Protective Order"). I held a hearing on the motion on April 15, 2008, and took the matter under advisement. The Motion for Protective Order is DENIED.

The Law Enforcement Defendants seek the following relief:

> [A]n Order from the Court directing that discovery not be had concerning the following subject matter areas: (1) personal identifying and personal contact information; (2) personal and background investigations conducted as part of the screening and hiring process; (3) internal affairs records and/or disciplinary records concerning same for all matters that post-date the Rice incident; and (4) internal affairs records and/or disciplinary records concerning same for all matters that pre-date the Rice incident but do not pertain to the housing and care of inmates. Law enforcement personnel have unique privacy interests given the inherent dangers associated with their work. Furthermore, these discrete subject matter areas bear no relevance to the claims asserted by Plaintiffs, nor is the disclosure of such information likely to lead to the discovery of admissible evidence.

Motion for Protective Order at ¶2.

This case arises from the arrest and subsequent death of a 24 year old woman while in the custody of the City and County of Denver. In particular, the plaintiffs have summarized the facts underlying their claims as follows:

At approximately 6:50 a.m. on February 18, 2006, Emily Rice was involved in a non-fatal car accident in which she suffered life-threatening injuries. Paramedics were summoned to the scene and, recognizing the potential severity of Ms. Rice's injuries, immobilized Ms. Rice and transported her to Denver Health. Upon arrival at Denver Health, Ms. Rice was first booked, and then admitted as a detainee to the Emergency Department of Denver Medical at approximately 7:45 a.m. Upon information an belief, Ms. Rice was briefly examined by a resident, . . . who indicated on a Trauma Flow Sheet that Ms. Rice was experiencing pain in two trauma sites, her left shoulder and her left abdomen/side. . . . According to medical records, Ms. Rice was given ibuprophin for pain at 9:25 a.m., and then released to the Denver Sheriffs at 10:00 a.m., despite the fact that she reported that she was in serious pain, and Denver Health had not taken reasonable steps to determine the cause of the pain.

Ms. Rice arrived at the Denver County Jail at approximately 10:50 a.m., where she was questioned and searched. . . . Defendants did not follow the normal booking procedure, but instead placed Ms. Rice in an isolation cell for several hours prior to booking her. Despite her medical condition and her serious pain, Ms. Rice was not taken to the jail nurse for evaluation during the intake process or for hours thereafter. At approximately 3:09 p.m., Ms. Rice, who was walking very unsteadily and holding the wall for assistance, was escorted to have her fingerprints and mug shots taken. Ms. Rice complained to a guard that she was feeling very bad and was finally, briefly allowed to speak with a nurse. . . . [The nurse] performed no medical evaluation of Ms. Rice. He simply looked at her records and cleared her, telling her that she was drunk and needed to "sleep it off." At this point, however, Ms. Rice had been in custody for over seven hours since her blood alcohol was measured at .121, and thus, could not have been "drunk." At approximately 3:18 p.m., as guards were filling out paperwork, Ms. Rice's eyes rolled back into her head, she fainted and fell to the floor, as guards stood by idly. . . . Although she had collapsed, Denver Jail staff did not take Ms. Rice back to Denver Health. . . .

Upon information and belief, at some point in the late afternoon or early evening of February 18th, a guard who was on duty . . . became increasingly concerned regarding Ms. Rice's complaints of numbness in her feet, and her own observation that Ms. Rice's feet were cold and grey. . . . Despite the fact that Ms. Rice had been released from Denver Health with a record that she had been in an

3

automobile accident and instructions to return to the hospital if she had any worsening symptoms or urgent concerns, [a jail nurse] refused to perform any medical evaluation or provide any medical care to Ms. Rice. Instead, without ever looking at the patient, [the nurse] arrived at her diagnosis and remedy: Ms. Rice was still drunk and needed to drink plenty of fluids and sleep it off. By this time, it had been approximately ten hours since Ms. Rice had consumed any alcohol.

Throughout the course of the evening and through the night, Ms. Rice and others confined in nearby cells called out for help, as Ms. Rice's serious medical need was obvious to other inmates. . . . The guards steadfastly refused to provide any medical care to Ms. Rice or to provide here access to medical treatment, despite the repeated and vocal urgings of Ms. Rice and other detainees, who could hear and observe that Ms. Rice was seriously injured.

At approximately 5:15 on the morning of February 19, 2006, another young female detainee (referred to herein as "NC") was escorted by a guard to a cell occupied by Ms. Rice. NC observed that Ms. Rice was moaning in pain. When NC asked Ms. Rice if she was okay, Ms. Rice informed her that she could not move her legs. Ms. Rice also told NC that she could not sit up. NC asked Ms. Rice if she should call for help, but Ms. Rice, who had been crying in vain for help throughout the night, told NC that calling for help was useless, as she and others had already told the guards, but nobody would listen. Shortly thereafter, a guard asked NC if she would like to make a telephone call. NC responded that she would, and also told the guard that he needed to help Ms. Rice because there was something wrong and she could not move. The guard opened the cell door to allow NC to exit and use the phone, and then directed Ms. Rice to get up and asked her what was wrong with her. While NC was at the telephone, she heard the guard call for a nurse and then walk down the hall into an office. A nurse appeared carrying an oxygen tank and a backpack, and was in Ms. Rice's cell along with a number of guards. According to medical records, Ms. Rice was unresponsive and showed no vital signs by the time that emergency medical personnel finally arrived. According to the "Final ED Assessment[,]" Ms. Rice died at 6:52 a.m. of cardiac arrest. [The doctor's assessment] also noted a "suspected spleen injury" related to Ms. Rice's car accident. According to autopsy reports, Ms. Rice died of injuries resulting from blunt force trauma to the abdomen, with an 18 cm gaping deep laceration in the liver and a laceration in the spleen. The

> autopsy also revealed considerable internal bleeding and three
> fractured ribs. Ms. Rice died of avoidable internal bleeding, alone
> in her cell, after many hours of excruciating pain.

Scheduling Order [Doc. # 106, filed 11/9/2007] at pp.5-9.

Based on these facts, the plaintiffs allege the following claims for relief:

(1) Failure to provide medical care and treatment in violation of 42 U.S.C. § 1983 against all defendants;

(2) Municipal liability for failure to train and supervise in violation of 42 U.S.C. § 1983 against the City and County of Denver and Denver Health;

(3) Supervisory liability for failure to train and supervise in violation of 42 U.S.C. § 1983 against identified supervisory jail defendants;

(4) First and Fourteenth Amendment deprivation of familial association against all defendants;

(5) State law claims for negligent training and supervision against the City and County of Denver, Denver Health, and the identified supervisory jail defendants;

(6) State law claims for outrageous conduct against specified defendants;

(7) State law wrongful death under section 13-21-202, C.R.S., against specified defendants;

(8) Medical negligence/negligent medical care and treatment against the Denver Health Defendants; and

(9) A "survival action" against all defendants.

Amended Complaint [Doc. # 258, filed 3/26/2008].

At issue here is the discoverability of the following materials which the plaintiffs have

5

requested or will request in discovery from the Law Enforcement Defendants:[1]

    (1)    Personal identifying information including:

    (a) Social Security numbers; (b) dates of birth; (c) home addresses; (d) home telephone numbers; (e) personal e-mail addresses; (f) drivers' license numbers; and (g) personal insurance information which may provide coverage for the claims asserted here;

    (2)    Personal and background investigations conducted as part of the screening and hiring process including:

    (a) National Crime Information Center and Colorado Bureau of Investigation records; (b) personal history statements; and (c) interviewer notes; and

    (3)    Internal affairs records and disciplinary records including:

    (a) records concerning investigations or discipline occurring after the death of Ms. Rice and not relating to her; and (b) records concerning investigations or discipline occurring before the death of Ms. Rice other than those relating to "housing and care of inmates."

### 1. Personal Identifying Information

With respect to their personal identifying information, the Law Enforcement Defendants argue that "the unique privacy interests of the deputy sheriff defendants prohibit the disclosure

---

[1] The plaintiffs either do not address or claim that they will not seek the following information for which the defendants seek a protective order: (1) identifying and contact information of the defendants' family members; (2) personal life, medical, and disability insurance information including the identification of beneficiaries, except any insurance which may provide coverage for the events at issue here; (3) psychological examinations; (4) medical examinations; (5) polygraph examinations; (6) fingerprint information; and (7) personal references. As to these matters, I make no ruling because the issues either are not in dispute or are not adequately addressed.

and discovery of personal identifying and personal contact information sought by plaintiffs to conduct background investigations." Motion for Protective Order at p.6. In support of this argument, the Law Enforcement Defendants rely principally on the decision of the Sixth Circuit Court of Appeals in Kallstrom v. City of Columbus, 136 F.3d 1055 (6th Cir. 1998).

In Kallstrom, the plaintiffs were *undercover* police officers who had been involved in the investigation of a "violent gang" which was conducting a drug conspiracy. 136 F.3d at 1059. A number of the officers had testified at the trials of some of the gang members. Id. Notwithstanding these facts, the City of Columbus had concluded that the Ohio Public Records Act "required it to release the officers' files upon request from *any member of the public*." Id. at 1059-60 (emphasis added). The files included the officers' addresses and phone numbers; the names, addresses, and phone numbers of immediate family members; the names and addresses of personal references; the officers' banking institutions and corresponding account information, including account balances; their social security numbers; responses to questions regarding their personal life asked during the course of polygraph examinations; and copies of their drivers' licenses, including pictures and home addresses. Id. at 1059. Under these facts, the trial court found "that in light of the [drug gang's] propensity for violence and intimidation, the release of these personnel files created a serious risk to the personal safety of the plaintiffs and those relatives named in the files." Id. The circuit court affirmed, stating that on the facts as found by the district court, the "City's disclosure of this private information about the officers . . . rises to constitutional dimensions," id. at 1063, requiring the city to demonstrate a compelling state interest before it could release the information. Id. at 1064. The circuit court noted, however:

7

> [W]e do not mean to imply that every governmental act which intrudes upon or threatens to intrude upon an individual's body invokes the Fourteenth Amendment. But where the release of private information *places an individual at substantial risk of serious bodily harm, possibly even death*, from a perceived likely threat, the magnitude of the liberty deprivation strips the very essence of personhood. Under these circumstances, the government act reaches a level of significance sufficient to invoke strict scrutiny as an invasion of personhood.

Id. (internal quotations and citations omitted; emphasis added).

The facts of this case are materially different from the facts presented in Kallstrom, and Kallstrom provides no guidance. Here, the defendants are county jail guards, and there is no evidence that their identities are not readily known to the inmates. There is nothing "undercover" about their work. The information here would be disclosed to lawyers who are members of the bar of this court, expert witnesses, and other limited persons specified in an existing blanket protective order.[2] The information would not be publicly available. Nor is there any evidence or suggestion that the plaintiffs in this case are violent gang members or that the disclosure of the officers' personal information to the limited categories of people permitted under the protective order would place the officers "at substantial risk of serious bodily harm, possibly even death." Id.

In this circuit, the disclosure of private information contained in personnel files, similar to that at issue here, is controlled by Denver Policemen's Protective Ass'n v. Lichstenstein, 660

---

[2]On November 9, 2007, I entered the Stipulation and Protective Order [Doc. # 108] which allows a party to designate as confidential "information that is confidential and implicates common law and statutory privacy interests," including appropriate portions of personnel and employment files. Id. at ¶7. Information designated as confidential may be used only for purposes of this litigation, id. at ¶3, and may be disclosed only to the limited categories of people specified in paragraph 15 of the protective order, which includes attorneys, parties, expert witnesses, court reporters, and deponents.

F.2d 432, 435 (10th Cir. 1981), where the Tenth Circuit Court of Appeals held:

> We may agree with appellant that, at least when government intervention is at stake, public officials . . . are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity.
>
> \* \* \*
>
> In some circumstances [personnel and investigation] files may contain personal data which could give rise to a right to confidentiality. However, the [plaintiff] concedes that a right to confidentiality in the files is not absolute. The [plaintiff] acknowledges the balancing test as set out in Martinelli [v. District Court, 612 P.2d 1083 (Colo. 1980)]. In applying this test the court must consider, (1) if the party asserting the right has a legitimate expectation of privacy, (2) if disclosure serves a compelling state interest, and (3) if disclosure can be made in the least intrusive manner.

As to most of the personal identifying information, the Law Enforcement Defendants have made no showing that it is maintained as private. For example, common experience is that most people do not adequately protect from disclosure their birth dates, home addresses or telephone numbers, e-mail addresses, or drivers' license numbers so as to reasonably call them private or confidential. Instead, that information is regularly disclosed to friends, relatives, vendors, credit card companies, schools, childrens' sports teams, on hotel registers, and the like. There is no evidence here that the Law Enforcement Defendants have maintained this information as private or confidential. In addition, Rule 26(a)(1)(A)(iv) requires the disclosure of any insurance which "may be available to satisfy all or part of a possible judgment in the action."

The Law Enforcement Defendants argue with particular emphasis that their Social Security numbers should not be disclosed "given today's risk of fraud and identity theft associated with the disclosure of such information." Motion for Protective Order at ¶16. I agree

9

that under certain circumstances the public disclosure of a Social Security number would invite mischief. However, applying the Lichtenstein test, I find that there are no such concerns here, where the Social Security numbers will be disclosed subject to the protective order which severely limits who may receive them and for what purpose they may be used. I assume that the Law Enforcement Defendants have a legitimate expectation of privacy in their Social Security numbers. Here, however, as in the Lichtenstein case, the ascertainment of truth in a judicial proceeding is a compelling state interest sufficient to require the disclosures. Finally, the disclosure of Social Security numbers to limited categories of people for the exclusive purpose of this lawsuit pursuant to the existing protective order constitutes the least intrusive manner and meets the requirements of Lichtenstein .[3]

The personal identifying information at issue here is necessary to allow the plaintiffs to conduct thorough background investigations of the Law Enforcement Defendants, and I find that such investigations may lead to the discovery of admissible evidence. Potential insurance coverage must be disclosed pursuant to Rule 26(a)(1)(A)(iv). Consequently, the personal identifying information is discoverable.

**2. Personal and Background Investigations**

The Law Enforcement Defendants argue that the second category of information at issue, involving personal and background information, "is not relevant to plaintiffs' claims, nor is it likely to lead to the discovery of admissible evidence." Motion for Protective Order at p.10. I disagree.

---

[3]I note that there is nothing unusual in the approach I adopt. To the contrary, it is commonplace in modern civil litigation to order the disclosure of personnel files containing information similar to that at issue here under these very conditions.

First, the plaintiffs are not seeking psychological examinations, medical examinations, or polygraph results. Plaintiffs' Response to Law Enforcement Defendants' Joint Motion for Protective Order [Doc. # 299, filed 4/7/2008] (the "Response") at p.14 n.8.

I find that the National Crime Information Center records, Colorado Bureau of Investigation records, personal history statements, and interviewer notes are relevant to the claims and defenses which are the subject of this action or are reasonably calculated to lead to the discovery of admissible information. See Rule 26(b)(1), Fed. R. Civ. P. As the plaintiffs argue in their Response:

> [I]nformation in [the Law Enforcement Defendants'] background may be relevant to the training and supervision required to properly insure the safety of those in their care. For example, if the City hired an individual with prior medical training, that individual may need less training and supervision in the medical care of inmates than those without that background. On the other hand, a law enforcement officer hired with a prior assault conviction may require closer training and supervision than other law enforcement agents without the same background.

Response at pp.14-15.

To the extent the Law Enforcement Defendants argue that this information is private, I find that under Lichtenstein the ascertainment of truth is a compelling state interest sufficient to require the disclosure, and disclosure of this information pursuant to the existing protective order constitutes the least intrusive manner. Lichstenstein, 660 F.2d at 435.

### 3. Internal Affairs Records and Disciplinary Records

Finally, the Law Enforcement Defendants argue that the "internal affairs investigations and discipline post-dating the Rice incident as well as investigations and discipline pre-dating the Rice incident but not pertaining to the housing and care of inmates are not relevant to

11

plaintiffs' claims and [nor] reasonably calculated to lead to the discovery of admissible evidence." Motion for Protective Order at p.12. Again, I disagree.

This case involves a claim of municipal liability for failure to train and supervise. Municipal liability is controlled by Monell v. Dept. of Social Services, 436 U.S. 658, 694 (1978), where the Supreme Court held that a plaintiff must show the existence of an official policy or custom to establish governmental liability:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

In response to an argument similar to that made here, the court in Everitt v. Brezzel, 750 F. Supp. 1063, 1069 (D. Colo. 1990), applied Monell, stating:

> While a single prior violation may not ordinarily amount to a "policy," the municipality may be liable where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates, but fail to take remedial steps.
>
> It is not possible to deal at the discovery stage of the case with many of the questions presented by Monell and its progeny. Suffice it to say that a plaintiff asserting municipal liability under Monell is entitled not only to factual information concerning an officer's alleged past violations, but also to information concerning his superiors' knowledge of those violations and what, if anything, they did about them.

(Internal quotations and citations omitted.)

First, with respect to pre-incident investigations and discipline, I am persuaded that it is improper for me to limit the plaintiffs to only those matters "pertaining to the housing and care of inmates." As the plaintiffs pointed out at argument, the discipline imposed may be

12

manipulated to hide the true nature of the underlying conduct leading to the discipline. The plaintiffs may probe through discovery what discipline has been imposed on the Law Enforcement Defendants and why. In addition, I find that post-incident investigations and discipline are relevant to the issue of policy or custom.

IT IS ORDERED that the Motion for Protective Order is DENIED.

Dated May 27, 2008.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge